# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MCFARLAND FARM PROPERTY OWNERS' ASSOCIATION, a Washington non-profit corporation, | No. 57231-1-II |
| Respondent. | |
| v. | |
| COLIN RYAN, a single man, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J. — Colin Ryan belonged to the McFarland Farm Property Owners' Association. The Association's protective covenants required any building erected or placed upon a member's property to present a finished external appearance within one year, required members to keep their properties free of clutter, and allowed the Association to cure the unsightly appearance of any structure.

After receiving complaints about Ryan's property, the Association's Board of Directors requested that Ryan replace the temporary roofing material on his house and barn with permanent roofing material. Recognizing that Ryan had a traumatic brain injury that made many tasks difficult, the Association gave Ryan a year to comply.

More than a year later, Ryan had not installed permanent roofs, so the Board again requested that Ryan fix them. It also requested that Ryan remove vehicles, construction materials, and brush piles from his property. After Ryan failed to provide a plan for getting his property into

compliance, the Association filed a lawsuit, seeking declaratory judgment that Ryan violated its protective covenants and an order compelling Ryan to comply. The parties proceeded to a bench trial in which Ryan represented himself. The trial court ruled in the Association's favor and awarded it attorney fees.

Ryan appeals, arguing that the trial court erred when it failed to sufficiently accommodate him as a pro se litigant with a traumatic brain injury, relied on misrepresentations by the Association, concluded that he violated the protective covenants, and failed to conclude that the Association selectively enforced its protective covenants against him. Ryan also makes several arguments for the first time on appeal, as well as arguments outside the scope of his appeal.

We affirm and award the Association attorney fees.

FACTS

I. BACKGROUND

In 2014, Ryan bought land that included a historic house and barn. As the land's owner, Ryan was required to belong to the Association. Members were subject to the Amendment and Restatement of Protective Covenants. Covenant 5.3.1 stated that any "building, dwelling[,] or outbuilding, erected or placed upon any parcel in the plat," had to "present a finished external appearance within one year from beginning of construction." Ex. 10, at 186. Covenant 5.8 forbade the "objectionable, illegal[,] or offensive use of land," including "such items as unused autos or auto bodies, or anything which constitutes unsightly clutter." *Id.* at 187. Covenant 5.11 allowed the Association to cure, at the owner's expense, any issues with structures whose appearance had become "unsightly" if the owner failed to respond within 60 days of proper notice. *Id.* And the

2

document provided that in "any action brought against any lot owner to enforce" the protective covenants, the prevailing party would be entitled to recover attorney fees. *Id.* at 188.

Soon after buying the property, Ryan sustained a traumatic brain injury, a condition that can cause "temporary or permanent impairments in emotional and cognitive functioning." Stacey Wood & Bhushan S. Agharkar, *Traumatic Brain Injury in Criminal Litigation*, 84 UMKC L. REV. 411 (2015). When the events leading to this appeal took place, Ryan was still recovering from the injury.

## II. PROTECTIVE COVENANT VIOLATIONS

In 2015, a member of the Association sent the Board a letter alleging that Ryan's property violated several protective covenants. The next year, the member sent the Board a similar letter.

In August 2017, the Board notified Ryan by letter that he was in violation of the protective covenants because the roof of his house was "covered with plastic tarps." Ex. 16, at 203. The letter stated that because of Ryan's medical challenges, the Board would give Ryan "until September 1, 2018 to install a permanent roof." *Id.* Ryan did not install a permanent roof by the deadline.

In August 2019, the Board sent Ryan another letter. It stated that Ryan violated Covenant 5.3.1, requiring buildings to present "a 'finished external appearance,'" because his "primary dwelling" had a "black plastic roof," and a "plastic covering . . . is considered to be temporary at best." Ex. 20, at 213. It also explained that the Board had deemed the black plastic roofing unsightly under Covenant 5.11. *Id.* It further stated that Ryan violated Covenant 5.8, forbidding "'unsightly clutter,'" because his lot was "littered with objectionable items," such as "multiple vehicles, a boat for sale, various construction materials[,] and numerous brush piles." *Id.*

3

The letter required Ryan to replace the "plastic sheeting on the roof with an [industry-accepted] roofing product," setting a deadline that gave Ryan about three months to complete the task. *Id.* And the letter required that Ryan remove "all brush piles, . . . all but two registered and licensed vehicles, the boat[,] and all construction materials" within the same timeframe. *Id.* In response, Ryan sent a letter threatening legal action and stating that the Board was harassing him.

Once the deadline elapsed, the Board sent Ryan a final notice stating that if Ryan did not comply with its prior requests setting a deadline that gave Ryan about another two months, the Board would "institute legal action." Ex. 22, at 218. Several days later, the Board sent Ryan a letter scheduling an association hearing and requesting that Ryan "present an appropriate written plan of corrective action to bring [his] property back into compliance." Ex. 24, at 224. The letter stated that failure to attend would "result in the immediate suspension of [Ryan's] voting rights for a period of 60 days" from the hearing. *Id.*

Our record contains a responsive letter from Ryan, although it is not clear if the Board received it. Ryan stated that the Board's requests did not adequately consider the historic value of his house and barn and his intention to restore them. He said he fully intended "to have all repairs done on the barn" by November 2020 and that he would focus on restoring the house starting in 2021. Clerk's Papers (CP) at 129. He added that he would turn the brush piles into mulch in mid-2020 and that in his opinion, there was "no debris on the property." *Id.*

Later that month, the Board sent Ryan a letter stating that despite "repeated written requests," he "failed to attend the [hearing] and/or deliver any corrective action plans." Ex. 25, at 226. The Board said it would continue to suspend Ryan's voting rights, and after another month, it would have "no choice but to pursue corrective action . . . through the legal system." *Id.*

4

### III. LAWSUIT

In September 2020, the Association filed a complaint against Ryan alleging violations of its protective covenants. The Association requested "a judicial declaration" that Ryan was in violation; "a mandatory injunction compelling [Ryan] to repair the roof" and "remove the brush piles, debris, and construction materials" from his property; and attorney fees. CP at 145.

Ryan, who represented himself, filed a response that appears to include text from an attorney's letter to the Association, although the record does not indicate whether an attorney ever sent the letter. The response stated, "Mr. Ryan demands that you immediately cease and desist from further harassment and intimidation." CP at 92. And it stated, "[I]t is highly likely that your actions targeting [Ryan] for alleged violations you are allowing others to get away with constitute a violation of the Fair Housing Act." *Id.* The response also requested a factfinding hearing before a judge where Ryan could present evidence.

The Association filed a list of exhibits it intended to introduce at trial under ER 904. Ryan did not object to any of these exhibits before trial.

A.    Bench Trial Procedure

At the beginning of the bench trial, the trial court gave Ryan a hearing device and an overview of how the trial would work. Ryan informed the trial court that he had a traumatic brain injury, but he did not make a formal request for any accommodation under GR 33. The trial court said it would do its best "to be patient and give [him] some extra time." Verbatim Rep. of Proc. (VRP) at 11.

When the Association's attorney began introducing exhibits, Ryan said he was "completely lost" because his copies of the exhibits seemed to be out of order. VRP at 22. The Association's

attorney responded that she gave him the copies in order. Ryan then said he was missing exhibits, and the trial court took a recess so the Association's attorney could make sure Ryan had the full set. Later, the trial court gave Ryan additional breaks when he said he felt overwhelmed.

During Ryan's examination of witnesses, the trial court occasionally interjected to summarize witnesses' answers using clearer language. While one witness testified, the trial court asked the witness if there was a document that would refresh his memory so Ryan could ask the witness about a specific meeting. The trial court also helped Ryan ask witnesses questions that would not yield objections. To allow Ryan to testify, the trial court offered to ask Ryan questions it believed an attorney would have asked and gave Ryan time to add anything else he thought was relevant. Before closing arguments began, the trial court explained their purpose.

B.      Bench Trial Testimony and Evidence

At trial, the Board's secretary testified that Ryan's house and barn had plastic roofs, and a different board member said the buildings had tarp roofs. Ryan testified that he used laminated fiberglass and that the solution was "intended to be . . . temporary." VRP at 123.

The Board's secretary also testified about clutter on Ryan's property, although he noted that Ryan had removed the brush piles the Association's letters mentioned. The trial court admitted photographs of Ryan's property, taken two weeks earlier, that showed piles of construction materials, including wood and pipes. The Board's secretary and Ryan testified that these materials were visible from the road.

C.    Trial Court's Ruling

In a memorandum opinion, the trial court relied on two protective covenants: Covenant 5.3.1, requiring any "building, dwelling[,] or outbuilding, erected or placed upon any parcel in the plat," to "present a finished external appearance within one year from beginning of construction"; and Covenant 5.8,[1] prohibiting any "objectionable, illegal[,] or offensive use of land," including "such items as unused autos or auto bodies, or anything which constitutes unsightly clutter." CP at 54-55.

The trial court found that in August 2017, the Board sent Ryan "a letter stating that . . . a permanent roof must be installed," but because of Ryan's medical condition, it would give him a year, "until September 1, 2018[,] to resolve this issue." CP at 55. The trial court found that the "Board never heard anything back from Mr. Ryan." *Id.*

Regarding the condition of Ryan's property at the time of the trial, the trial court found that Ryan "had not installed permanent roofing on the residence or the barn and [continued] to have various construction materials stored on the property that [were] visible from the surrounding area." CP at 56.

The trial court entered declaratory judgment that Ryan was "in violation of the protective covenants." CP at 22. It ordered Ryan to, within 90 days, give the Board "a plan, with a clearly articulated timeline, proposed by a licensed roofing contractor, . . . to install permanent roofing." CP at 23. It further ordered Ryan to, within 180 days, "clear his property of all construction

---

[1] While the trial court referenced a different protective covenant, it quoted Covenant 5.8, and its findings of fact indicate that it relied on Covenant 5.8.

material, any remaining brush[,] and all junk vehicles." CP at 22. And it awarded the Association attorney fees "as provided in the governing documents." CP at 23.

Ryan filed a motion for reconsideration, which the trial court denied.

Ryan appeals the trial court's judgment.

## ANALYSIS

### I. ACCOMMODATION

Ryan argues that the trial court failed to accommodate him as a pro se litigant with a traumatic brain injury. The Association responds that there "is no error by the court in proceeding with Mr. Ryan representing himself at trial and holding him to the same procedural rules as if he had an attorney." Br. of Resp't at 10. We hold that under the circumstances of this case, where Ryan did not make a request for any specific accommodation under GR 33 below, the trial court did not fail to adequately accommodate Ryan.

In general, "pro se litigants are bound by the same rules of procedure and substantive law as attorneys." *Westberg v. All-Purpose Structures, Inc.*, 86 Wn. App. 405, 411, 936 P.2d 1175 (1997). However, GR 33 provides a mechanism for people with disabilities to make requests for specific accommodations. In addition, Division Three has more generally held that in some circumstances, courts must treat pro se litigants with disabilities differently. *Carver v. State*, 147 Wn. App. 567, 575, 197 P.3d 678 (2008); *In re Marriage of Gharst*, 25 Wn. App. 2d 752, 759, 525 P.3d 250 (2023).

For example, in *Carver*, the trial court dismissed a pro se litigant's discrimination lawsuit against the Department of Corrections, the litigant's former employer, on the basis of collateral estoppel. 147 Wn. App. at 571. Noting that the Department of Corrections "had concluded that

[the litigant] suffered from dementia to the extent that she could not even perform basic office work and that there was no position in the entire department she could hold," Division Three held on appeal that "it would work an injustice to apply collateral estoppel" to her case. *Id.* at 575.

More recently, in *Gharst*, a pro se litigant "filed a pro se motion for relief from judgment under CR 60(b) shortly after she failed to appear for her divorce trial," arguing excusable neglect and attributing "her nonappearance to a brain injury that was a result of a series of strokes." 25 Wn. App. 2d at 754. The court held that relief "from judgment based on excusable neglect requires an analysis of . . . a litigant's mental state" and noted "that a pro se litigant who also suffers from a significant mental disability should not be held to the same standard as an attorney." *Id.* at 759.

Here, the record does not show that the trial court failed to accommodate Ryan in the same way that the trial courts in *Carver* and *Gharst* failed to account for the parties' cognitive disabilities. The trial court gave Ryan a hearing device, explained how trials work, took a recess so the Association's attorney could make sure Ryan had copies of all its exhibits, clarified witness testimony when necessary, checked in with Ryan when he appeared to need breaks, helped Ryan ask witnesses appropriate questions, and asked Ryan questions so he could testify on his own behalf.

While there is no dispute that Ryan has a disability that affects his cognition, this case is different from *Carver* and *Gharst*. In those cases, the pro se litigants' lawsuits were dismissed on procedural grounds, whereas Ryan had the opportunity to argue the merits of his case, and the trial court here took steps to ensure that Ryan was fully heard. The record does not show that Ryan requested any specific accommodation that he was denied below, and the trial court was as mindful of Ryan's disability as it reasonably could have been without such a request, given that pro se

litigants must generally follow the same rules as attorneys. *See* GR 33 (defining accommodations and delineating the process for requesting them). Given Ryan's traumatic brain injury and lack of formal legal training, he was undoubtedly in a difficult position. However, under these circumstances, the trial court did not fail to accommodate him.

## II. PROTECTIVE COVENANT VIOLATIONS

Ryan argues that we must reverse the trial court's judgment because the Association introduced false evidence that "obviously tainted the decision by the court." Opening Br. of Appellant at 14. Specifically, Ryan argues that he has never had blue plastic tarps on his roofs, that the construction materials on his property were usable, that he responded to the letter the Board sent about his roof in August 2017, that the cars on his property were all operational and registered, that his septic system was never open or visible, that he was not living in a travel trailer on his property, and that he did not have two dwelling units on his property. We disagree.

"Where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether those findings of fact support the trial court's conclusions of law." *Green v. Normandy Park*, 137 Wn. App. 665, 689, 151 P.3d 1038 (2007). We presume the trial court's findings of fact are correct, "and the party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence." *Id.* "Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise." *Id.*

A.    Findings of Fact

The trial court found that two of the Association's protective covenants were relevant to the parties' dispute: Covenant 5.3.1 and Covenant 5.8. The trial court accurately described the

covenants, and Ryan does not challenge the fact that the Association accused him of failing to comply with those covenants.

The trial court also found that, as of the trial date, Ryan "had not installed permanent roofing on the residence or the barn and [continued] to have various construction materials stored on the property that [were] visible from the surrounding area." CP at 56. Substantial evidence supports these findings. The Board's secretary, another Board member, and Ryan himself all testified that the house and barn had temporary instead of permanent roofs. Although Ryan argues that he has never had blue plastic tarps on his roofs, in light of his admission that the roofs were temporary, the roofs' specific material is not relevant. Additionally, photos the Association took two weeks before the trial showed piles of construction materials on Ryan's property, and both the Board's secretary and Ryan himself testified that these materials were visible from the road. Ryan's assertion that he was planning to use the construction materials does not contradict this testimony.

Ryan challenges the trial court's finding that he did not respond to the Board's 2017 letter requesting that he install "a permanent roof." CP at 55. In challenging this finding, Ryan points out letters he sent the Board two years later, in 2019, in response to further communication from the Board. Moreover, the Board's secretary testified that the Board sent Ryan the 2017 letter by certified mail, that he and another board member hand-delivered a copy of the letter because the Board did not receive a return receipt, and that Ryan refused to take the letter so he left a copy on Ryan's car. The secretary also testified that Ryan did not comply with the letter's request that he repair his roof. The copy of the letter contains handwritten notes consistent with the secretary's testimony. Substantial evidence thus supports this finding.

Ryan challenges other evidence as false, but the trial court made no findings of fact about the cars on his property, his septic system, his travel trailer, or the number of dwelling units on his property. The lack of findings demonstrates that the trial court did not rely on these facts in making its ruling.

Finally, to the extent Ryan challenges the trial court's decision to admit the Association's evidence, he does not provide support for this challenge. An appellant must provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). "Appellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010). Here, Ryan did not make evidentiary objections to the Association's exhibits below, and he does not explain on appeal which rules of evidence the trial court violated.

Ryan has not met his burden of showing that the findings of fact he challenges are unsupported by substantial evidence.

B.     Conclusions of Law

For the first time on appeal, Ryan argues that Covenant 5.3.1 does not apply to him. Covenant 5.3.1 states that any building "erected or placed upon any parcel in the plat[] must present a finished external appearance within one year from beginning of construction." Ex. 10, at 186. But Ryan argues that his buildings "were already on the site long before" the Association's formation, so he "has not erected any new buildings." Opening Br. of Appellant at 14. We decline to reach this argument.

In general, we "may refuse to review any claim of error [that] was not raised in the trial court." RAP 2.5(a). "'The purpose of this general rule is to give the trial court an opportunity to correct errors and avoid unnecessary retrials.'" *Buck Mountain Owners' Ass'n v. Prestwich*, 174 Wn. App. 702, 720, 308 P.3d 644 (2013) (quoting *Postema v. Postema Enters., Inc.*, 118 Wn. App. 185, 193, 72 P.3d 1122 (2003)).

Ryan did not argue below that Covenant 5.3.1 does not apply to the buildings on his property, so the trial court did not have the opportunity to analyze this issue with the benefit of argument from both sides. Ryan does not argue that we should nevertheless reach this issue under RAP 2.5. We therefore decline to review this claim of error.

The trial court's findings of fact support its conclusion that Ryan violated the protective covenants. Ryan violated Covenant 5.3.1, requiring buildings to "present a finished external appearance," by failing to install permanent roofing on the house and barn. CP at 54. Ryan violated Covenant 5.8, forbidding clutter on the property, by keeping piles of construction materials in places that were visible from the road. And even if these violations were not enough, under Covenant 5.11, the Association had a right to cure if the appearance of any structure remained unsightly.[2]

In sum, substantial evidence supports the challenged findings of fact, and the trial court's findings of fact support the conclusion that Ryan violated the Association's protective covenants.

## III. SELECTIVE ENFORCEMENT

Ryan argues that the Association "has not been practicing equal enforcement" of its protective covenants and that its selective enforcement violated RCW 64.90.405(9). Opening Br.

---

[2] Under RAP 2.5, we may *affirm* on any basis supported by the record.

of Appellant at 9. RCW 64.90.405(9) states that the board of a common interest community "may not be arbitrary or capricious in taking enforcement action."

Ryan contends that our record "contains photos from the neighborhood showing other properties with similar issues," but "those homeowners have not had their voting rights suspended or been sued." Opening Br. of Appellant at 9-10. He contends that several members violated the covenants by having businesses, secondary dwelling units, dwellings that do not meet size requirements, and clutter on their properties.

Assuming without deciding that the Association is governed by the 2018 Washington Uniform Common Interest Ownership Act, chapter 64.90 RCW, Ryan has not presented evidence that the Association has selectively enforced the covenants. While the record contains photos of other properties in the area, it does not indicate whether the properties' owners are members of the Association and, if so, whether the Association has taken enforcement action against those members. Ryan alleges in his opening brief that specific members violated the covenants, but the record similarly lacks information about their membership and enforcement actions against them. And the record shows that the Board planned to take legal action against at least four other members for covenant violations.

Ryan has not shown that the Association selectively enforced its protective covenants.

IV. OTHER ARGUMENTS

A.     Improperly Raised Fair Housing Act Argument

Ryan argues that the Association "has failed to uphold the Fair Housing Act." Opening Br. of Appellant at 3. In his reply brief, he specifically argues that the Association violated 42 U.S.C. § 3604(f)(3)(B). We decline to reach this argument.

The Fair Housing Act forbids discrimination against a person "'in the provision of services or facilities in connection with [their] dwelling'" on the basis of that person's disability. *Dubois v. Ass'n of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1178-79 (9th Cir. 2006) (quoting 42 U.S.C. § 3604(f)(2)). "Discrimination includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford . . . equal opportunity to use and enjoy a dwelling.'" *Id.* at 1179 (quoting 42 U.S.C. § 3604(f)(3)(B)). "'The reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination.'" *Id.* (quoting *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997)).

To show a refusal to make a reasonable accommodation in violation of 42 U.S.C. § 3604(f)(3), a plaintiff must prove that they have a disability for purposes of the Fair Housing Act, that the defendant knew or reasonably should have known about the disability, that an accommodation may be necessary to give the plaintiff "an equal opportunity to use and enjoy the dwelling," "that the accommodation is reasonable," and that the "defendant refused to make the requested accommodation." *Id.*

Here, we decline to reach Ryan's Fair Housing Act claim. As stated above, it is the appellant's responsibility to provide argument, including legal authority and citation to the record, in support of the issues they raise, and we need not consider arguments unsupported by meaningful analysis. RAP 10.3(a)(6); *Cook*, 158 Wn. App. at 794. The responsibility to provide meaningful analysis is especially important in this context because determining whether the Association violated the Fair Housing Act would require a "'highly fact-specific'" inquiry. *Dubois*, 453 F.3d at 1179 (quoting *Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d at 1380).

Ryan has not identified the specific accommodation he needed to have an equal opportunity to use and enjoy his dwelling, so it follows that he has not explained why the accommodation is reasonable and how the Association has refused to make it. Moreover, our record does not contain the information necessary to answer these questions. In his "response" to the Association's complaint, Ryan appeared to include the text of an attorney's cease and desist letter to the Association, which stated that it was "highly likely" the Association's "actions targeting him" constituted violations "of the Fair Housing Act." CP at 92. But Ryan did not otherwise make arguments below about the Fair Housing Act, and our record lacks argument from the Association and a ruling from the trial court on this issue.

We decline to reach Ryan's argument that the Association violated the Fair Housing Act.

B.      Arguments Outside the Scope of Appeal

Ryan argues that the Association violated former RCW 64.38.045(2) (1995), which required homeowners' associations to make the names and addresses of members available to all other members. Ryan also argues that the trial court should have dissolved the Association for violating RCW 24.03A.936(1)(b) and (2)(b), which state that a court may dissolve a nonprofit corporation if it exceeds or abuses its authority or if its directors act in an illegal, oppressive, or fraudulent manner. And Ryan argues that the Association has harassed him. We decline to reach these arguments.

Our "review is necessarily limited by the scope of a given appeal." *Clark County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 177 Wn.2d 136, 145, 298 P.3d 704 (2013)). "The scope of a given appeal is determined by the notice of appeal, the assignments of error, and the substantive argumentation of the parties." *Id.* at 144. "Initially, the notice of appeal must properly designate

16

the decision or part of the decision that the party wants reviewed." *Id.* at 144-45. That designation "subjects to potential review any related order that 'prejudicially affected the designated decision and was entered before review was accepted.'" *Id.* at 145 (quoting *In re Dependency of Brown*, 149 Wn.2d 836, 840 n.2, 72 P.3d 757 (2003)).

Here, we decline to reach these arguments because they are outside the scope of Ryan's appeal. Ryan appealed the trial court's judgment, which declared that he violated the Association's protective covenants, made orders consistent with that declaration, and awarded the Association attorney fees. The only other decision our record contains is the denial of Ryan's motion for reconsideration. Ryan now claims that the Association must make members' names and addresses available; exceeded or abused its authority, presumably in ways not addressed by his other arguments; acted in an illegal, oppressive, or fraudulent manner; and harassed him. These claims are unrelated to the determinations the trial court made in its judgment and accompanying memorandum opinion. Had Ryan wanted the trial court to address these claims in its judgment, he would have needed to properly make them below.

ATTORNEY FEES

Citing its covenants, the Association requests attorney fees on appeal under RAP 18.1(b). The Amendment and Restatement of Protective Covenants states that in "any action brought against any lot owner to enforce any" covenant, "the prevailing party shall be entitled to recover . . . a reasonable sum fixed by the court . . . for attorney's fees." Ex. 10, at 188.

If a contract "specifically provides that attorneys' fees and costs . . . incurred to enforce" its provisions will be awarded to the prevailing party, the prevailing party "shall be entitled to reasonable attorneys' fees" and costs. RCW 4.84.330. "A contract provision that authorizes

No. 57231-1-II

attorney fees below authorizes attorney fees on appeal." *Nw. Cascade, Inc. v. Unique Constr., Inc.*, 187 Wn. App. 685, 705, 351 P.3d 172 (2015).

Here, the Amendment and Restatement of Protective Covenants requires us to award the Association attorney fees because it is the prevailing party.

CONCLUSION

We affirm and award attorney fees on appeal to the Association in an amount to be determined by a Commissioner of this court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Maxa, J.

Cruser, J.

18